## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| 3 STEP SPORTS LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>MARK CAMPION )<br><br>Defendant. ) | **CIVIL NO.: 25-cv-11603** |

## <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

Plaintiff 3 Step Sports LLC ("3Step" or the "Company") brings this action against its former employee, Mark Campion ("Campion") for breach of contract, breach of fiduciary duty, tortious interference with business relations, trade secret misappropriation, unjust enrichment, and unfair and deceptive business practices. As alleged herein, Campion flagrantly and maliciously violated the terms of his contractual obligations to 3Step, as well as his common law duties of loyalty and fair dealing to the Company.

During his employment, 3Step provided Campion with access to confidential business information and entrusted him to manage the Company's relationships with its key partners and vendors. In return, and among other things, Campion (a) misappropriated proprietary data; (b) sabotaged corporate relationships; and (c) solicited business and other employees away from 3Step both before and after his resignation in April 2025—all in service of competing ventures he launched using 3Step's know-how, goodwill, and trade secrets and other

1

confidential and proprietary business information. Campion's actions have caused, and continue to cause, irreparable harm to 3Step's business, relationships, and reputation, necessitating immediate judicial intervention and appropriate remedies.

## PARTIES

1.      3Step is a Delaware limited liability company with its corporate headquarters at 500 Unicorn Park Drive, 5th Floor, Woburn, Massachusetts 01801.

2.      Mark Campion is an individual who maintains a residential address in Spring City, Pennsylvania 19475.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, at least because these claims are so related to claims in the action within original jurisdiction that they form part of the same case or controversy.

4.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Campion contractually agreed to Massachusetts jurisdiction and venue.

5.      Campion is subject to personal jurisdiction in this judicial district for at least the same reasons that venue is appropriate here.

## FACTS

### *3Step*

6.      3Step is the nation's largest and most connected youth sports club and event company, providing events, training, camps, and related services to youth athletes across the

country in nine sports: baseball, basketball, combat, fastpitch softball, field hockey, football, lacrosse, soccer, and volleyball.

7.      3Step's business involves securing venues for club sports events and camps, recruiting young athletes to participate in their club programs, recruiting third party club programs to participate in their tournaments, and working with both licensors and corporate sponsors to operate branded events. One element of 3Step's successful business model is the identification and acquisition of other sports brands to expand its operational footprint and increase revenue.

### *Competitive Edge Sports ECP, LLC*

8.      3Step entered the volleyball market in 2019 by acquiring the assets of Competitive Edge Sports ECP, LLC and East Coast Power Volleyball, LLC, Campion's former employer. Through fifteen additional volleyball business asset acquisitions completed between 2019 and 2023, 3Step is now one of the largest operators of youth volleyball events and club programs in the country.

9.      Those acquisitions allowed 3Step to create two complementary business lines:

a.   East Coast Power Volleyball ("ECP"), a seven-division Philadelphia and Delaware-area volleyball club with roughly 80 teams and almost 1,000 youth athletes, and

b.   Top Court Events ("Top Court"), a nationwide youth volleyball tournament platform that now runs more than thirty annual events across regional tournament series, including the Northeast Power Series, Florida Power

Series, the Pacific Northwest Power Series, and a series of "Top Court

National" events.

10.     Campion commenced employment with 3Step on or about October 26, 2019,

when 3Step entered the volleyball market.

11.     On or about April 30, 2020, Campion signed an acknowledgment that he had

received 3Step's employee handbook (the "Handbook"). A true and accurate copy of the

Handbook Acknowledgement has been attached hereto at **Exhibit A**. Campion's signature also

evidenced his understanding that the Handbook "contains information regarding the

Company's rules and benefits which affect [Campion] as an employee."

12.     The Handbook required Campion to, among other things, "act in the best interest

of the company, regardless of personal preference…" (**Exhibit A** at 16.)

### *The Non-Disclosure Agreement*

13.     On or about April 30, 2020, Campion also executed a "Proprietary Information

and Invention Agreement" (the "Confidentiality Agreement") containing non-disclosure and

return-of-property covenants. A true and accurate copy of the Confidentiality Agreement has

been attached hereto at **Exhibit B**.

14.     By its terms, the Confidentiality Agreement survives "the termination of

[Campion's] relationship with the Company regardless of the reasons for such termination

and/or the circumstances surrounding such termination." (**Exhibit B**, § 11.)

15.      Section 2 of the Confidentiality Agreement provides as follows:

> Except as may be required by the Company in connection with and
> during my relationship with the Company, or with the express written
> permission of the Company signed by a duly authorized officer of the

Company, I shall not: (i) either during my relationship with the Company or after that relationship terminates, whether voluntarily or involuntarily, directly or indirectly use, including, but not limited to, via Social Media, any Proprietary Information for my own benefit or for the benefit of another or in any way adverse to the Company's business interests; and (ii) during the period of my relationship with the Company, access any Proprietary Information that I do not have a need to know.

16.    Section 1 of the Confidentiality Agreement defines the term "Proprietary Information."

17.    Section 1 of the Confidentiality Agreement also provides as follows:

I agree that, both during the term of my relationship with the Company and thereafter, I shall hold all such Proprietary Information in the strictest confidence and shall not disclose such Proprietary Information to any person, firm or corporation in any way (except as necessary in carrying out my work for the Company, consistent with the Company's policies), and to use my best efforts and to exercise utmost diligence to protect and prevent the unauthorized disclosure to others of any portion of the Proprietary Information. I further agree that I will not alter or destroy any Proprietary Information either during my term of my relationship with the Company or thereafter, unless properly authorized to do so by the Company and that I will immediately report to the Company activities by any individual or entity that I suspect may compromise the security of any Proprietary Information.

18.    Section 3 of the Confidentiality Agreement provides as follows:

I agree that all agreements, memoranda, notes, records, drawings, manuals, programs, codes, procedures, formulas and any other materials belonging to the Company concerning, without limitation, (i) any process or product designed, programmed, manufactured, used, developed, modified, investigated or considered by the Company (ii) any method of doing business by the Company; (iii) any customer or employee of the Company; (iv) any copyrights, programs, designs, codes or other Proprietary Information belonging to the Company or any of its customers; or (v) any other Company activity, are and shall be the exclusive property of the Company and shall be delivered, along with all copies thereof, to the Company upon termination of my relationship with the Company or at any other time upon request. I agree that upon termination of my relationship with the Company, I shall remove from

my personal Social Media any designation or indication that I am
currently affiliated with the Company.

19.    In section 6 of the Confidentiality Agreement, Campion agreed that "all works of
authorship, literary works… audiovisual works… compilations, and any other written
materials" that Campion originated or produced in the scope of his employment with 3Step are
considered "works for hire" and thereby the Company's property (Confidentiality Agreement §
6).

20.    Section 9 of the Confidentiality Agreement provides as follows:

> I understand and acknowledge that the Company's Proprietary
> Information, Inventions and goodwill are of a special, unique, unusual,
> extraordinary character which gives them a peculiar value, the loss of
> which cannot be reasonably compensated by damages in an action at law.
> I understand and acknowledge that, in addition to any and all other
> rights or remedies that the Company may possess, the Company shall be
> entitled to injunctive and other equitable relief, without posting a bond,
> to prevent a breach or threatened breach of this Agreement (and/or any
> provision thereof) by me. Further, I agree that I shall be responsible for
> payment of the Company's reasonable attorneys' fees in the event the
> Company prevails in any action against me to enforce this Agreement.

21.    In section 10 of the Confidentiality Agreement, Campion acknowledged that
during his employment with the Company, the Company would train him in the Company's
business and he "will acquire experience, skills and knowledge related to the Company's
business" and "that the Company depends upon its goodwill which it will entrust to [Campion]
during the term of [his] relationship with the Company" through his interactions with 3Step's
"clients, customers, accounts, prospects, suppliers, licensees, franchisors and franchisees."
(Confidentiality Agreement §10).

22.     In section 10 of the Confidentiality Agreement, Campion further acknowledged the Confidentiality Agreement "shall remain in full force and effect" regardless of any change in his relationship with 3Step. (Confidentiality Agreement §10).

### *Campion's Employment and Resignation*

23.     Campion worked through roles of increasing responsibility and leadership at 3Step, initially as a highly valued employee in 3Step's volleyball division and eventually a key business leader. By early 2024, 3Step promoted Campion to Regional Vice President, West Region, giving him oversight of several 3Step volleyball and basketball brands, together with management authority over their respective directors.

24.     Campion also held the parallel title of Brand Director for Top Court throughout his tenure at 3Step. Top Court is a highly valuable brand family for 3Step. Top Court generates millions of dollars in revenue for 3Step and has enormous brand value in the volleyball tournament space, both through partnerships with other volleyball programs and with companies like Under Armour.

25.     3Step's competitive edge in youth sports rests on a vertical integration strategy that combines club operations, tournament platforms, facility relationships, and sponsorship deals into a far-reaching nationwide network of opportunities for athletes and teams.

26.     For every Top Court tournament, Campion had principal authority over venue selection, contract negotiation, Convention and Visitor Bureau relations (the state and county-level tourism agencies that often provide sponsorship funds and facilitate local labor, accommodations, and other vendors), hotel blocks, vendor coordination, staffing, referee

procurement, validating event-specific profit and loss statements, and ensuring accurate expense allocations and revenue-share distributions to event partners.

27.     Before joining 3Step, Campion had no meaningful contacts in the premier volleyball-tournament market; every relationship he cultivated with national-level facilities, vendors, and partners arose solely from his roles within 3Step. As Director of Top Court and as a 3Step leader, he enjoyed unfettered access to (a) confidential pricing models; (b) growth strategies; (c) customer lists and key vendor and partner relationships; and (d) 3Step's forward financial projections—information 3Step safeguards as trade secrets and commercially confidential information through restricted-access databases, written policies, and employee non-use and confidentiality agreements.

28.     Campion knew that the volleyball season is cyclical, stemming from USA Volleyball and regional member chapter governance that club-volleyball tryouts open annually in mid-July, and that clubs host open sessions at gymnasiums throughout June and July to recruit players. The volleyball tournament schedule follows this timeline each year, with tournaments operated through the fall and winter until each season wraps, typically sometime in June.

29.     Staging a major volleyball tournament calls for considerable lead time. Finding a venue large enough for multiple courts, competing for highly-coveted dates at convention centers and sports complexes – and then negotiating related contracts, marketing the event, and filling team spots each takes months to accomplish. To capture the annual recruiting cycle and consistently execute the tournament smoothly, successful tournament operators must have

facilities scheduled and under agreement significantly in advance—typically, no less than 6-24 months before the planned event.

30.     When 3Step scrambled, after Campion's exit, to salvage 2026 dates with a long-standing convention center partner, the facility advised that its reservations are typically locked in eighteen months ahead, underscoring how Campion's inaction put the 2026 Top Court schedule in immediate jeopardy.

31.     Early contracting is standard and essential in the industry to protect premier weekends.  Under Campion's management, key 2025 events were contracted 120 – 450 days before the scheduled tournament dates. Examples include events at York Expo Center (456 days in advance), Broward County Convention Center (392 days in advance), and Baltimore Convention Center (406 days in advance).

32.     In late February 2025, Campion asked to be relieved of his West Region VP role and self-selected to focus exclusively on his role as Director of Top Court, a decision which 3Step leadership found to be strange, given that it was a step down in leadership. At that time, Campion also asserted that Bridget Carey ("Carey"), would be the Assistant Director of Top Court and report directly to him. Unbeknownst to 3Step Human Resources ("HR") at the time, Carey and Campion had begun a romantic relationship during their employment at 3Step and had recently purchased a home together, which fact they had gone to great lengths to keep quiet. Campion did not even update the HR system with his correct home address (as the one that he shared with Carey) until after he had delivered the notice of his resignation. Had 3Step been aware of the relationship between Carey and Campion, it would not have permitted Carey to report to Campion in violation of its standard conflict of interest policies for employees.

33.    On April 2, 2025, Campion verbally informed HR that first Carey, and then he intended to resign.

34.    3Step's HR representative then asked Campion to refrain from sending a resignation notice or communicating his resignation to anyone until he had spoken directly with Chad Gruen, CEO of 3Step ("Mr. Gruen"), and Campion agreed.

35.    Despite Campion's verbal assurance not to take action until he spoke with Mr. Gruen, he sent his letter of resignation from 3Step the next morning on April 3, 2025, initially communicating a notice period of only 10 calendar days.

36.    When Campion first advised 3Step of his resignation, he made no effort whatsoever to transfer the extensive, leadership-level knowledge and system access he possessed – venue contracts, contract status, budgeting files, and log-ins– to anyone at 3Step. Only after 3Step expressly requested a transition period did Campion agree to remain for a limited hand-off, and even then he failed to answer emails and the assistance he provided was minimal and incomplete. Campion's employment ultimately terminated on April 18, 2025.

37.    Following Campion's departure, 3Step discovered that on or about March 18, 2025—while Campion was still employed with 3Step—Campion, in concert with other former and then-soon-to-be former 3Step employees (including Carey), registered Vanguard Elite Volleyball Academy, LLC ("VEVA") with the Commonwealth of Pennsylvania, to be effective on April 1, 2025. A copy of VEVA's Certificate of Organization is attached as **Exhibit C**.

38.    Public records from the Pennsylvania Department of State show that Center Court Events, LLC ("Center Court") was also organized on March 18, 2025—the exact same day that VEVA was formed—and lists the identical registered office address at 529 Foundry Road,

West Norriton, Pennsylvania as VEVA, and has virtually all the same organizers. A copy of Center Court's Certification of Organization is attached as **Exhibit D**.

39.     The existence of Center Court further confirms that Campion's scheme was pre-meditated and multifaceted: by launching multiple interrelated entities on the eve of his resignation, he sought to fracture 3Step's goodwill, divert business under different names, and frustrate 3Step's ability to enforce its contracts and protect its trade secrets.

### *Campion's Laptop*

40.     After he announced his intent to resign, Campion initially resisted returning his 3Step laptop. When 3Step's HR representative reminded him that the laptop is company property, he agreed to return it.

41.     In connection with Campion's resignation, 3Step HR further instructed Campion not to take, remove, or delete any information related to his employment at 3Step. Campion was also advised to review his ongoing obligations to 3Step.

42.     Ultimately, Campion left his laptop in his office, completely wiped of data that he knew belonged to the 3Step under the Confidentiality Agreement.

43.     System logs show abnormal access patterns in the weeks before Campion's resignation, and 3Step continues to investigate what confidential financial projections, customer, facility contracts, rosters, pricing matrices and email communications may have been deleted, accessed and downloaded, and/or transmitted externally by Campion or at his direction.

### *Campion's Failure to Secure Facilities*

44.     Following Campion's departure, 3Step learned the breadth of his efforts both to interfere with the Company's future business operations and to sabotage valuable corporate relationships, the latter of which already has resulted in threats of legal action against 3Step.

45.     Although Campion knew that Top Court tournaments require significant lead times to secure venues in a highly competitive marketplace, when he left 3Step in April 2025 he had not begun the rental process, let alone secured renewal dates, for the vast majority of the 30+ event locations needed for the 2026 Top Court schedule.

46.     Shortly before his departure from the Company, Campion effectively admitted that the failure to secure venues was intentional during transition meeting on or about April 9, 2025 with Carey and Chris Hames ("Hames"), the incoming Top Court Brand Director. During that call, Campion and Carey advised Hames "not to take the job because everything is a mess" and acknowledged that no 2026 venues had been secured without acknowledging that it had been solely their responsibility to do so.

47.     On or about March 4, 2025, Kate Henwood ("Henwood"), Vice President of 3Step's Mid-Atlantic Region, arrived at the Company's regional headquarters in Conshohocken, Pennsylvania. Given Campion's roots in ECP – a key brand in the Mid-Atlantic region – and his leadership role within 3Step, she planned to confirm with Campion that he would attend the Mid-Atlantic Summit she was hosting that week. Another Top Court employee in the office told Henwood that Campion was "offsite at a meeting with the Philadelphia Expo Center." Despite Campion having previously indicated to Henwood that he would attend the 3Step Mid-Atlantic Summit, it was only upon Henwood sending Campion a text message the morning of March 6 –

the last half-day of the Summit – that Campion confirmed he would not be attending the 3Step event.

48. On April 17, 2025 – one day before Campion's resignation became effective – Hames contacted the Philadelphia Expo Center to secure the February 14-15, 2026 dates for 3Step's annual Top Court "Prez Day Showdown" tournament over President's Day weekend. Other 3Step employees subsequently reached out to support the relationship with the Philadelphia Expo Center to secure the 2026 renewal dates, only to learn on May 15, 2025, that the venue was already booked for those dates. On May 22, 2025, 3Step learned that the February 14-15, 2026, dates were already rented to Campion's new competing venture. The annual Prez Day Showdown, operated by 3Step since 2023, and projected to earn more than $100,000 in profit in 2026, is now at risk of cancellation.

49. In view of Campion's knowledge of 3Step's confidential information, experience, and skill at operating volleyball events, it is objectively clear that Campion acted intentionally to sabotage Top Court's business on his way out of 3Step. On information and belief, Campion's efforts to sabotage 3Step's business were intended to advance the business of Campion's new, competing venture.

50. Campion's lack of care and intentional scheme to directly compete with 3Step - whether through one or both of Campion's new ventures - damaged 3Step's business relationships with certain facilities and will likely damage 3Step's business if it is unable to secure future key Top Court event dates due to Campion's actions.

### *Campion's Interference With 3Step's Business Relationships*

51.     3Step learned after Campion's departure that, while still employed with 3Step, Campion began contacting certain of 3Step's employees, business partners, and the sports venues that host Top Court and other 3Step events with the aim to steer their business to his new venture.

52.     For example, while still on 3Step's payroll, Campion contacted one of 3Step's longstanding multi-court venue partners —a complex with three premier facilities in Pennsylvania and Ohio—to lock in prime 2026 weekends for his competing venture. That venue relationship is crucial to 3Step's volleyball operations: its flagship Pennsylvania location houses ten permanent hardwood courts under one roof, eliminating the need for 3Step to install temporary flooring as it must do at convention centers. The turnkey layout and national reputation of that complex delivers significant logistical savings and enables 3Step to stage more than a dozen high-profile tournament weekends there each year.

53.     To reclaim those critical dates for 2026, 3Step was forced, for the first time, to offer revenue guarantees, exposing 3Step to a significant and previously unnecessary level of financial risk.

54.     Prior to his departure, Campion also interfered with 3Step's partner entity for events in Florida, by failing to provide the partner with timely and contractually mandated profit-and-loss statements. This partner now asserts that 3Step owes it a significant amount of money in revenue share distributions from events dating back to the 2023 season.

55.     In connection with the Florida Power Series – valuable in part due to the desirability of Florida as an appealing travel destination – Campion failed to renew the 2026 facility contracts for both the Broward County and Orange County Convention Centers.

56.     Although its business partner helped 3Step regain certain of its contracts with some of the lost venues, the partner has since notified 3Step that it no longer wishes to partner on the series, putting nearly half a million dollars of the Company's gross profit from the Florida Power Series at risk.

57.     Also significantly, 3Step learned that Campion attempted to sabotage a critical joint venture relationship with a long-standing tournament partner with which the Company co-hosts other Top Court events in the Northeast region.

58.     Campion served as this partner's primary point of contact at 3Step during his employment.

59.     On or about April 22, 2025, 3Step received a breach notice from the partner stating that it had not received either the past due revenue share payment or hotel commission fees for a joint event.

60.     A senior 3Step employee contacted the partner's principal to cure the breach and preserve the relationship, introduce replacement points of contact for Campion, and gain a better understanding of any potential issues that may exist between the companies.

61.     From that call, 3Step learned the following:

   a.   Campion had not provided any financial reporting for recent events to the partner, violating a contractual obligation of which Campion was aware,

15

understandably frustrating the partner, especially given the profit-sharing

arrangement that was in place;

b.  Despite being aware that the partner company has a non-compete obligation

with 3Step, Campion recently reached out to the partner company to discuss

partnering with Campion and his new venture moving forward instead of

3Step. The partner also expressed concerns that the current agreement term

with 3Step was expiring and that Campion had done nothing to transition

the relationship internally. Given this, the partner expressed doubt about

3Step's continued viability as a co-host and raised concerns that Campion's

new entity would siphon teams from Top Court events, thereby undermining

the partnership's profitability.

c.  The partner company also noted that they maintain primary relationships

with all but one of the Pennsylvania sports facilities where Top Court hosts

events, making their continued collaboration with 3Step/Top Court essential

to 3Step's ability to schedule events in the future.

62.    Campion's interference with this core partnership has jeopardized nearly a

million dollars in potential profit and threatened 3Step's ability to secure facilities for volleyball

events in Pennsylvania, where Campion lives and where he has launched one or more newly

formed entities - including VEVA, Center Court, or any other affiliate Campion may establish.

63.    Using 3Step's confidential information to engage in such solicitations of and

interfere with 3Step partnerships violates Campion's obligations under the Confidentiality

Agreement and his duty of loyalty to 3Step as his employer.

64.     Campion's communications, individually and/or by and through VEVA, Center Court, or another entity, to solicit 3Step's clients, employees, and business partnerships constitute an ongoing, continuing violation of the Confidentiality Agreement and other related agreements Campion has with 3Step and infringe upon 3Step's interests in its (i) trade secrets, (ii) exclusive venue relationships, and (iii) partner profit-sharing arrangements.

65.     Reputational and goodwill damage magnifies 3Step's monetary losses: internal and third—party club directors, venue operators, and business partners now question 3Step's reliability in light of the breach notices, cancelled events, and uncertainty Campion's conduct has caused.

## COUNT I
*Breach of Contract*

66.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

67.     The Confidentiality Agreement was and continues to be a valid, binding, and enforceable contract between Campion and 3Step.

68.     3Step performed all of its material obligations under the Confidentiality Agreement.

69.     Campion breached the Confidentiality Agreement, at least, by (a) misusing and failing to return 3Step's Proprietary Information; (b) using without authorization 3Step's Proprietary Information to solicit 3Step's partners and vendors for his own benefit and/or the benefit of third-parties; (c) deleting 3Step's data in violation of the Confidentiality Agreement's

preservation and return provisions; and (d) competing directly with 3Step using goodwill and relationships developed during his employment.

70.     3Step has suffered and, if Campion is left unrestrained, will continue to suffer irreparable harm as a result of Campion's breach of the terms of the PIAA.

71.     Through his acts and omissions, Campion breached his contractual and fiduciary duties, misappropriated 3Step's trade-secret relationships, and deliberately positioned his new venture – whether VEVA, Center Court, or another entity - to assume the facilities, partners, and customer base that 3Step spent millions of dollars and many years building.

## COUNT II
*Breach of Duty of Loyalty*

72.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

73.     Both during his employment as a senior employee at 3Step and as a departing employee, Campion owed 3Step a duty of loyalty.

74.     Campion was aware of his duty to 3Step.

75.     Campion breached that duty by, among other things: (a) failing to disclose his competing interests in VEVA and Center Court; (b) taking actions to damage 3Step's vendor relationships and future events; and (c) soliciting 3Step's business partners and key vendors while still employed.

76.     3Step has suffered and, if Campion is left unrestrained, will continue to suffer irreparable harm as a result of Campion's breaches of his duty of loyalty to 3Step.

## COUNT III

*Tortious Interference with Advantageous Business Relationships*

77.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

78.     3Step has ongoing relationships with its customers, clients, sponsors, facilities, and event partners.

79.     Campion was aware of these relationships and, without justification, interfered with them by: (a) misusing 3Step's Proprietary Information; (b) soliciting vendors and partners under contract with 3Step; (c) leveraging confidential knowledge to create distrust in 3Step's ability to perform under existing and future agreements; and (d) interfering with a vital joint venture relationship with partner companies.

80.     3Step has suffered and will continue to suffer irreparable harm as a result of Campion's tortious interference with 3Step's existing and prospective business relationships if Campion is left unrestrained.

## COUNT IV

*Unjust Enrichment*

81.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

82.     Through Campion's role at 3Step, he obtained access to the Company's trade secrets and other confidential and proprietary business information, including but not limited

to venue arrangements, pricing structures, client and vendor relationships, strategic plans, and branded program operations.

83.     By misappropriating this information and leveraging relationships built and funded by 3Step, Campion has conferred upon himself substantial benefits.

84.     Campion has retained and continues to retain these benefits without paying for their value.

85.     3Step has suffered and, if Campion is left unrestrained, will continue to suffer irreparable harm as a result of Campion's misconduct.

### COUNT V
*Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.*

86.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

87.     As part of his employment, Campion was entrusted with access to 3Step's trade secrets. The trade secret information, which is owned by 3Step, comprises confidential customer and sales-related information, including customer identities, needs, requirements, opportunities, and challenges, product pricing, volume expectations, customer purchase forecasts, and marketing and sales strategies.

88.     The trade secret information misappropriated by Campion satisfies the definition of "trade secret" under 18 U.S.C. § 1839(3).

89.     3Step's trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

90.     Each of the trade secrets at issue is used in the development of or in connection with 3Step's products and services, all of which are marketed and sold in interstate commerce.

91.     3Step has taken reasonable measures to ensure the confidentiality of its trade secrets, including but not limited to: disclosing such information only to necessary persons, requiring Campion and other employees to execute and abide by the Confidentiality Agreement as part of their employment, requiring third parties to execute and abide by non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software, and issuing explicit post-employment instructions concerning the return and non-use of 3Step's proprietary materials.

92.     Campion has knowingly and intentionally stolen and misappropriated trade secrets from 3Step and took those trade secrets without authorization by way of his employment at 3Step.

93.     To this day, Campion continues to use 3Step's trade secrets in bringing to market products and services that directly compete with 3Step's products and services and targeting specific 3Step customers for sales based on such trade secret information.

94.     Campion's conduct was willful and malicious, entitling 3Step to an award of exemplary damages and attorneys' fees.

95.     As a direct and proximate result of Campion's misappropriation, 3Step has suffered, and continues to suffer, substantial damages, which include but are not limited to lost sales and price erosion.

96.     3Step has suffered and will continue to suffer irreparable harm as a result of Campion's misappropriation if Campion is left unrestrained.

## COUNT VI
*Violation of the Massachusetts Uniform Trade Secrets Act (M.G.L. c. 93L)*

97.     3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

98.     As part of his employment, Campion was entrusted with access to 3Step's confidential, proprietary, and trade secret information, including but not limited to event budgets and projections; vendor and facility contract terms; customer lists and preferences; pricing information; proprietary operational and marketing strategies; and planning timelines for youth volleyball tournaments and branded partnerships (the "Trade Secrets").

99.     These Trade Secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. 3Step has taken reasonable measures to protect the secrecy of this information, including but not limited to requiring Campion and other employees to sign the Confidentiality Agreement; restricting access to this information within the Company; and issuing explicit post-employment instructions concerning the return and non-use of proprietary materials.

100.    Campion misappropriated 3Step's Trade Secrets by improperly retaining, deleting, disclosing or using such information following Campion's resignation, including for the purpose of launching and operating a directly competing volleyball events business.

101.    As a result of Campion's misappropriation, 3Step has been damaged, in an amount to be determined at trial.

## COUNT VII
*Computer Fraud, 18 U.S.C. § 1030*

102.    3Step repeats and incorporates each of the foregoing paragraphs as if fully set forth herein.

103.    Campion, knowingly and with the intent to defraud 3Step, accessed without authority and/or exceeded authorized access to 3Step's protected computers and digital systems, and by that access obtained, destroyed, or concealed valuable 3Step trade-secret and other confidential business information.

104.    For example, after announcing his resignation, Campion (i) initially refused to return his Company-issued laptop, (ii) then left the device in his office completely wiped of Company data, despite explicit instructions not to delete or remove any information, and (iii) engaged in abnormal system-log activity in the weeks preceding his departure that 3Step is still investigating to determine the full scope of deleted or transmitted materials.

105.    Campion's intentional and malicious destruction of electronic data disrupted 3Step's business, damaged its relationships with vendors and event partners, and deprived 3Step of the use and value of its proprietary information.

106.    As a direct and proximate result of Campion's conduct, 3Step has suffered, and continues to suffer, substantial damages, which include but are not limited to significant reputational harm and interference with 3Step's business relations.

107.    3Step has suffered and will continue to suffer irreparable harm as a result of Campion's misappropriation if he is left unrestrained.

## COUNT VIII
### *Violation of M.G.L. c. 93A*

108.    3Step repeats and incorporates each of the above paragraphs as if fully set forth herein.

109.    As set forth above, Campion has knowingly and willfully engaged in unfair and deceptive acts and practices concerning 3Step's business relationships and reputation, in violation of G.L. c. 93A.

110.    As set forth above, Campion's conduct was unfair and deceptive.

111.    3Step has been damaged by Campion's violations of G.L. c. 93A, in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff 3 Step Sports LLC respectfully requests that the Court enter judgment as follows:

(1)    Declaring that Campion is liable on each of the respective Counts set forth above;

(2)    Granting a preliminary and permanent injunction, enjoining Campion, and all other persons acting in concert or participation with him, from: (a) further misappropriation of 3Step's trade secrets and confidential and proprietary information, (b) soliciting 3Step's clients, partners, vendors, employees, or business contacts in violation of his contractual and statutory obligations; and (c) otherwise engaging in conduct that breaches the Proprietary Information and Invention Agreement or any fiduciary duty owed to 3Step;

(3)    Awarding 3Step judgment for damages in excess of $150,000 and in an amount to be determined at trial adequate to compensate for Campion's activities,

including supplemental damages where permitted, together with pre-judgment and post-judgment interest on the damages awarded;

(4)    Awarding Plaintiff all costs and attorneys' fees under G.L. c. 93A, the respective agreements between Plaintiff and Defendant, as applicable, and as otherwise allowed by law;

(5)    Awarding punitive and/or exemplary damages on all claims as permitted by statute;

(6)    Award Plaintiff double and/or treble damages under G.L. c. 93A;

(7)    For disgorgement of all ill-gotten gains Campion has unjustly attained by his illegal acts, and/or an order compelling Campion to pay reasonable royalties to the extent that Campion is not enjoined from the above violations and for the use of 3Step's trade secrets and confidential and proprietary business information;

(8)    For pre- and post-judgment interest as permitted by law;

(9)    For an order awarding 3Step its attorneys' fees and costs; and

(10)    Granting any and such further relief as the Court deems just and proper.


## JURY DEMAND

3Step hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

3 STEP SPORTS LLC

By its attorneys,

*/s/ Marc C. Laredo*

Marc C. Laredo (BBO #543973)
Brendan S. Cox (BBO #669482)
Darshana Indira (BBO # 694109)
William G. Cosmas, Jr. (BBO #670631)
LAREDO, SMITH & KANE LLP
101 Federal Street, Suite 650
Boston, MA 02110
(617) 443-1100
*laredo@laredosmith.com*
*cox@laredosmith.com*
*indira@laredosmith.com*
*cosmas@laredosmith.com*

Dated: June 3, 2025

**<u>VERIFICATION</u>**

I, Greg Waldbaum, hereby state on my oath that I have reviewed the allegations contained in the above Verified Complaint, and the facts set forth therein are true based on my own personal knowledge, except for those allegations made on information and belief, and as to those I believe them to be true.

Sworn under the penalties of perjury on this 3rd day of June, 2025.

*Greg Waldbaum*
_____
Greg Waldbaum
President, 3 Step Sports LLC